Filed 8/31/23  P. v. Wiley CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081077 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD293494) |
| GARY JOE WILEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Gary Joe Wiley of robbery (Pen. Code,[1] § 211) and found that he also personally used a firearm in committing the offense (§ 12022.53, subd. (b)). Wiley contends on appeal that there is insufficient evidence to support his robbery conviction. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Robbery*

Around 9:00 a.m. on the morning of August 23, 2021, security cameras outside of American Legion on 47th Street in San Diego recorded a man wearing a yellow reflective vest exiting a car parked across the street. He walked up and down the street, returned to the car, and then meandered towards the intersection in front of American Legion, drinking from a cup in one hand and holding a white hard hat in the other. Around 10:03 a.m., he walked north along 47th Street out of the camera's view.

A few minutes later around 10:06 a.m., security cameras at Sunrise Market and Gas, located just north of American Legion along 47th Street, recorded a man with the same physical appearance walking towards the gas station while holding a white lidded coffee cup and a white hard hat. The gas station footage, which provided a closer view of the man, showed that he wore a neon yellow reflective vest, a blue neck gaiter around his neck, and a brown camouflage head covering. As the man walked through the convenience store holding the cup and hard hat, at one point he spilled liquid from the cup into the hard hat and onto the floor. He wiped up the spill and threw the cup away in a trash can near the store's entrance.

An external camera recorded the man leaving the gas station and walking back south down 47th Street at around 10:09 a.m. Around that

---

[1] All further statutory references are to the Penal Code.

same time, cameras at American Legion recorded a man with the same physical appearance, in a yellow reflective vest and holding a white hard hat, walking south on 47th Street. He returned to the parked car, and around 10:16 a.m., he walked towards American Legion.

Meanwhile, D.C. arrived for work at American Legion around that time, entering through the front door. Minutes later, the man in the yellow vest tried unsuccessfully to enter American Legion through the front door before circling around to the back of the building. At this point, the man's blue neck gaiter was pulled over the lower half of his face.

D.C. watched the man try to enter American Legion's front door from a surveillance monitor feed in her office. She was not expecting anyone other than a cleaning crew, and because she did not recognize the man, she did not let him into the building. D.C. was in her office when she suddenly saw the man standing in the doorway, pointing a gun at her face and demanding money. Internal camera footage shows the man entered D.C.'s office around 10:21 a.m. wearing a neon yellow vest, a blue gaiter around the bottom part of his face, and a brown camouflage head covering.

The man kept the gun pointed at D.C. while she handed him cash from American Legion's safe. D.C. handed the man approximately $3,000, and camera footage recorded the man leaving the building with the cash, jogging to the same parked car he had arrived in, and driving away.

*B. The Investigation and Trial Evidence*

D.C. called 911 and police arrived on the scene minutes later around 10:35 a.m. D.C. described the suspect as a slim black male between 50 and 60 years old, wearing a mask and a fluorescent yellow-green reflective vest over dark clothing. That same day, an investigating detective reviewed footage from American Legion's surveillance cameras. He observed from

3

video footage recorded inside the office that the suspect had large blood vessels on his right arm. The detective also noted that someone fitting the suspect's description had walked north along 47th Street shortly after 10:00 a.m., before the robbery occurred. After determining that the suspect may have been walking to Sunrise Market and Gas, the detective went to the gas station convenience store around 3:00 p.m. that same day and reviewed footage from the station's security cameras. When he observed that the suspect had discarded a cup in the trash can, the detective immediately went to the trash can and retrieved a white lidded Styrofoam cup which matched the cup the suspect was holding in surveillance footage.

The detective testified that the trash can contained "only a few items," and that the cup he retrieved was the only item in the trash that resembled the cup in the surveillance video. He noted that the cup was white with a brown oval logo, as depicted in surveillance footage. The convenience store manager testified that the store does not offer white Styrofoam cups like the one found in the trash can, and a photograph admitted at trial showed that the gas station uses colorful cups with a different design.

In October 2021, lab results showed that DNA swabbed from the cup matched Wiley's. The lab detected a single source of DNA from a swab of the cup's lid, taken from a location where one would drink. The investigating detective alerted police that Wiley was wanted in connection with a pending robbery investigation.

Several months after the robbery in February 2022, a patrol officer stopped Wiley for riding his motorcycle without a helmet. After conducting a records check and discovering Wiley was wanted in connection with a crime, the officer arrested Wiley and brought him to police headquarters. A search

4

of Wiley's motorcycle uncovered construction gear, including an orange reflective vest and a yellow hard hat.

The detective collected a DNA sample from Wiley's mouth after his arrest, and lab results later showed "very strong support" for a match between Wiley's DNA and the DNA swabbed from the cup found in the convenience store trash can. A forensic expert testified that while it was possible that DNA transferred onto the cup from another item in the trash, such transfer was not likely here.

The detective also noted after Wiley's arrest that Wiley matched the general description of the robbery suspect. The detective photographed Wiley's forearms after observing that he had "veins that were protruding in his forearm" as the robbery suspect did.

An investigator obtained call detail records associated with Wiley's phone number from the day of the robbery. Those records showed that on the morning of the robbery, calls made from Wiley's phone number connected with cell towers located in the Mid-City area of San Diego, indicating his cell phone was in that area. Shortly before the robbery, call records showed that his cell phone was in American Legion's vicinity at the same time the suspect appeared on surveillance cameras outside of American Legion. Around 10:25 a.m., soon after the robbery occurred, Wiley's number placed a call near American Legion, and minutes later, call data indicated his cell phone was moving away from the area. By 10:40 a.m., call data showed Wiley's number making calls from the Mid-City area again. Several of the calls placed from Wiley's number were made to a number associated with Wiley's daughter.

*C. Other Witness Testimony*

Wiley's former supervisor testified at trial that Wiley had worked in construction for several years. In August 2021, the month of the robbery,

Wiley was working at a construction site in Mid-City. But his supervisor was not at the job site on the day of the robbery, and he did not personally see Wiley that morning. According to pay stubs, Wiley's work hours varied and sometimes he worked 40 hours a week with overtime, while other weeks he only worked 16 hours. Wiley had to wear a hard hat and reflective vest while on the job, but workers could "wear any color they like." His supervisor saw Wiley drive both a car and a motorcycle "off and on" to work, and he said he never saw Wiley with a firearm or large amounts of cash.

Wiley's girlfriend testified that he was working almost every day in August 2021, except for Sundays. She said she never saw Wiley with a gun in August 2021, nor did she see him bring large amounts of cash home. But she was not with Wiley at the time of the robbery.

*D. Verdict and Sentencing*

The People charged Wiley with robbery and alleged he personally used a firearm in committing the robbery. The jury found him guilty of robbery and found true the firearm allegation. The trial court denied Wiley's motion for a new trial, and after a bifurcated bench trial on alleged priors and aggravating factors, the court struck the firearm enhancement and sentenced him to 25 years to life in prison pursuant to the Three Strikes Law. (§ 667, subd. (e)(2)(ii).) Wiley timely appealed.

DISCUSSION

Wiley contends there is insufficient evidence to support his conviction for robbery under section 211. More specifically, he contends that no

substantial evidence supports a finding that he is the person depicted in surveillance videos robbing American Legion.  We disagree.

On review, we must " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.)  We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*).)  "Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

We conclude that substantial evidence supports the jury's finding that Wiley committed the robbery.  Camera recordings from American Legion and the nearby gas station provided a nearly uninterrupted visual timeline of the robbery suspect's movements and physical appearance before, during, and after the incident.  Video footage first captured the suspect parking a car near American Legion and walking around the area wearing a distinctive yellow vest, drinking from a cup, and holding a white hard hat.  The suspect then walked north, where gas station cameras captured a closer view of him

7

with the same yellow vest, cup, and white hard hat, as well as a blue neck gaiter and brown camouflage head covering. The footage shows the suspect discarding a white cup with a brown oval logo into the convenience store trash can. The suspect then walked south into the view of the American Legion cameras, which captured him returning to his parked car briefly before making his way into American Legion. The video inside the office clearly shows a man wearing a reflective neon yellow vest, a blue neck gaiter, and a brown camouflage head covering, all of which matches what the suspect wore when he was at the gas station. After departing American Legion with the cash, the suspect then jogged to the same parked car he arrived in.

It was plainly reasonable for the jury to conclude, based on the continuity of the video footage both geographically and chronologically, that the suspect shown in the American Legion footage was the same individual featured in the gas station videos. The suspect wore the same distinctive clothing and traveled a path that corresponded directly with the locations surveilled by both sets of cameras. Furthermore, there is no evidence that anyone in American Legion's vicinity or in the convenience store around the time of the robbery was similarly dressed or matched the suspect's general appearance, such that the suspect might have been confused with someone else.

It was thus also reasonable for the jury to conclude that the DNA from the cup in the convenience store trash can, which matched Wiley's DNA, belonged to the suspect. The trash can contained "only a few items," and no other item in the trash can was similar to the cup the suspect was holding in surveillance footage. The cups in the store had a different design, making it unlikely that the cup in evidence came from another individual in the store.

8

The detective retrieved the cup mere hours after the robbery, and there is no evidence suggesting that the trash can was emptied in the time between when the suspect discarded his cup and when the detective found the cup bearing Wiley's DNA. Furthermore, a forensic expert testified it was unlikely that Wiley's DNA somehow transferred onto the cup from another item in the trash can.

The call detail records associated with Wiley's phone number further support the conclusion that he was near American Legion when the robbery occurred. The fact that calls were made from Wiley's number to his daughter indicate that he was the person making those calls. The records also show that his phone was in Mid-City before and after the robbery, which is consistent with his former supervisor's testimony that Wiley was working at a construction site in Mid-City that month.

Wiley cites cases in which courts found insufficient evidence to support a conviction where the only link between the defendant and the crime scene was fingerprint evidence. (See, e.g., *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, 355–356 [insufficient evidence where case "rested exclusively upon the fact" that defendant's fingerprints were found among 46 other fingerprints at the crime scene]; *People v. Johnson* (1984) 158 Cal.App.3d 850, 856 [fingerprint on container insufficient to show possession of contraband]; *People v. Jenkins* (1979) 91 Cal.App.3d 579, 584–585 [same]; *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 937–938 [fingerprint on cigarette lighter in rental vehicle insufficient to bind defendant over for trial in burglary case].) But those cases are distinguishable because there is far more evidence beyond DNA connecting Wiley to the robbery. Surveillance footage and witness testimony showed that Wiley matched the suspect's physical description. That same footage connected the cup itself, and the DNA found

9

on the lid, directly to the robbery suspect.  Wiley's former supervisor testified that Wiley was working in construction at the time of the robbery, and Wiley's call detail records also placed him at or near the scene when the robbery occurred.

Although a different color hat and vest were found in Wiley's motorcycle at the time of his arrest, that difference could be explained by the fact that his arrest occurred several months after the robbery, and that his former supervisor allowed him to wear any color protective gear of his choosing.  Moreover, a reasonable jury could conclude that the hat and vest were consistent with Wiley working in construction, which supports an inference that he also wore construction gear at the time of the robbery.

Accepting the logical inferences that the jury might have drawn from the evidence, we conclude there is sufficient evidence to support the jury's finding that Wiley committed the robbery at American Legion.  (*Maury*, *supra*, 30 Cal.4th at p. 396.)

DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.

10